Lisa Ann BURNS, Appellant,

v.

McGREGOR ELECTRONIC
INDUSTRIES, INC.,
Appellee.

No. 90–2504.

United States Court of Appeals,
Eighth Circuit.

Submitted May 15, 1991.

Decided Jan. 30, 1992.

William G. Blum, Dubuque, Iowa, for appellant.

Gary L. Robinson and Kimberly A. Ten Eick, Cedar Rapids, Iowa, for appellee.

Before FAGG, Circuit Judge, HENLEY, Senior Circuit Judge, and WOLLMAN, Circuit Judge.

WOLLMAN, Circuit Judge.

Lisa Ann Burns appeals from the judgment entered in favor of McGregor Electronic Industries, Inc., following the trial in her Title VII sexual harassment suit. We reverse and remand.

I.

On August 30, 1985, Burns filed a complaint alleging constructive discharge from her employment with McGregor, a stereo speaker manufacturer employing fifty to seventy-five workers. She sought back pay, reinstatement, and all other related relief. Burns had worked at McGregor during three separate periods: October 14, 1980 through August 10, 1981; September 15, 1981 through June 20, 1983; and September 26, 1983 through July 19, 1984.

McGregor, which is located in McGregor, Iowa, is owned by Paul Oslac, a resident of Chicago, Illinois. Burns testified that during her first period of employment with McGregor, manager-trainee Marla Ludvik often made sexual comments as Burns left the restroom, such as "have you been playing with yourself in there?" Ludvik also made almost daily comments to other workers that she did not think Burns took douches, that she saw Burns riding in Oslac's car, and that Burns was going out with Oslac. Ludvik tried to convince Burns to date male employees. Supervisors Cleo Martin and Eldon Rytilahti heard Ludvik's remarks. Burns complained to Martin and to Mary Jean Standford, then the plant manager, but nothing changed.

The plant consisted of assembly lines in the basement and on the main floor, an office, a laboratory, and a third floor apartment used by Oslac when he visited the plant. Burns testified that Oslac showed her advertisements for pornographic films in *Penthouse* magazine, talked about sex, asked her to watch pornographic movies with him, and made lewd gestures, such as ones imitating masturbation. A former worker, Kim Heisz, saw one of Oslac's gestures. Oslac asked Burns for dates at least once a week. She gave him excuses rather than direct refusals because, she testified, she feared the loss of her job. She stated that his behavior made her angry, upset, and "real nervous," and that sometimes she would cry at work or at home. Burns also testified that there was no one above Oslac to whom she could complain; and that although she received no complaints, her work slowed down and she started dropping assembly parts. She voluntarily left McGregor on August 10, 1981.

Burns returned on September 15, 1981, because, she maintained, she needed the

work. The newly-hired plant manager, Virginia Kelley, placed her in a higher-paying quality control job. Burns testified that during this period Oslac visited the plant from 11:00 a.m. Monday until 9:00 a.m. Tuesday of each week and that he spent most of this time with her. He continued to ask for dates and wanted to engage in oral sex so she would "be able to perform [her] work better." When Burns refused a date, Oslac told her, "I'm tired of your fooling around and always turning me down. You must not need your job very bad." Believing that Oslac intended to fire her, she accepted an invitation to dinner at his apartment on the condition that her mother would join them. Burns testified that her mother refused to go, so her father, Daniel Burns, went with her. As the district court found, Oslac appeared shocked when Burns' father appeared at the dinner with Burns. After the meal, Daniel Burns told Oslac he knew what was going on and for Oslac "to leave the girls alone at work."

Burns further testified that during her second period of employment Ludvik, who was then a supervisor, circulated a petition to have Burns fired because nude photographs of her, taken by her father, appeared in two motorcycle magazines—*Easyrider* and *In the Wind.* One full frontal view of Burns revealed a pelvic tatoo; two photographs highlighted jewelry attached to her pierced nipples. Burns testified that she had willingly allowed her father to do the piercing and photography. She did not take copies of the magazines into the plant. Former employee Deborah Johnson testified that she saw Ludvik showing employees the magazine and the petition. Burns testified that after Oslac learned about the nude photos from Ludvik, he told her, "They're ganging up on you and trying to get rid of you. If you don't go out with me, I might just let them do it." Oslac then asked Burns to pose nude for him in the plant in return for overtime pay.

Burns further testified that she was humiliated by plant gossip that she was Os-

lac's girlfriend; that supervisor June Volske tried to get her to sit on Oslac's lap, to go out with him, or to go up to his apartment; and that coworker Eugene Ottaway called her vulgar names.[1] She complained to Kelley, who appeared to try to "do something" for a period of time, and to Kelley's successor. Burns testified that her second period of employment was "hostile" and "extremely worse" than the first. She quit again on June 20, 1983.

Burns returned to McGregor for the third time on September 26, 1983, because, she said, Kelley had returned to the plant and because she needed work to support herself, her father, and her brother. When Burns expressed concerns about Oslac's behavior, Kelley assured her that Oslac would no longer enter the plant. Oslac continued to visit Burns, although he did not spend as much time with her as he had previously. According to Burns, he repeatedly asked her to go out, pose nude, and watch pornographic movies. On one occasion when other employees were present, Oslac threw his arm around her, cupped his hand as if to grab her breast, and said, "Well, I see I got you back, lover." He also gave her an *Easyrider* calendar.

Oslac had not visited the plant within the four to six weeks preceding Burns' last day, July 19, 1984. On that day, Burns asked Ottaway to move stacks of speakers, and he refused. Burns reported this to a supervisor, who instructed Ottaway to move the speakers. Ottaway then pushed and shoved the stacks, all the while calling Burns a series of vulgar names similar to those he admitted to having called her on other occasions, and placed the speakers so high she could not reach them. When Burns asked him to make the stacks lower, Ottaway threw the speakers across the room. Burns began crying and tried to get a supervisor to stop Ottaway, but the supervisor did nothing. Burns left work and did not return.

---

1. We deem it unnecessary to repeat the language that Eugene Ottaway directed towards Burns. Suffice it to say that no reasonable person would consider that language to be anything other than demeaning, obscene, and offensive.

Burns testified that the overall work environment was "hostile and offensive." She testified that during the last six weeks of her third period of employment at McGregor she overheard Ottaway tell a fellow worker that "he should throw [Burns] over the [conveyor] belts" and commit an act of sodomitic intercourse upon her. Called as a witness for McGregor, Ottaway denied making the statement attributed to him by Burns about "throwing her over the belts." He admitted on direct examination, however, that he had called Burns names—"anything nasty." He testified that Burns had responded by calling him similar names. He further testified that during the speaker-throwing incident on July 19, 1984, he was angry at Burns and had "called her every name in the book." Finally, on redirect examination, he testified that he hadn't treated Burns any differently than he had the other women working at the plant.

Coworker Diane Zinkle testified that Eugene Ottaway and other male employees had subjected Burns to continual verbal abuse. She also testified that Burns did not yell or call Ottaway names during the July 19 speaker-throwing incident.

Coworker Mary Ellen White testified by deposition that the general working atmosphere at McGregor was bad and characterized it as the "last resort of anybody that needs a job." While she never saw Oslac ever directly harass Burns, she said that she had seen Oslac touch almost everyone in the plant in improper ways. She had seen Oslac sit under the conveyor belt rubbing the legs of the women at the line and had seen him rubbing the front or the back of female workers with his hands or a newspaper. She overheard Oslac telling dirty jokes on several occasions. She once saw Oslac drop his pants to his knees in front of several female workers. She overheard Oslac say that he wanted to show them a bruise on his leg. Oslac was, according to White, "always" in Burns' testing booth. She said that Ottaway harassed Burns on the line and that Volske "picked" on Burns. She stated that she was subject to constant comments from supervisors at the plant which she con-

sidered to be sexually harassing, such as "have you got your period," and "if you didn't have sex all night, you wouldn't be tired." She also heard these sorts of comments directed at Burns and Burns' mother.

Testifying by way of deposition, Oslac denied Burns' allegations. He testified that he had invited Burns and her father to dinner at his apartment because Burns was planning to quit and that he convinced her father to talk her into staying. He claimed that he never talked to Burns at all during her last period of employment. He admitted spending quite a bit of time in her testing booth during her second period of employment, but said that Burns needed a lot of encouragement. He admitted showing several workers a bruise, but said that he pulled his pant leg up to do so and did not drop his pants to his knees. He claimed that the *Easyrider* calendar was given to him by Burns, not the other way around.

On the basis of this and other testimony, the district court indicated that it had some difficulty in determining what actually went on at McGregor because "rumor and gossip ran rampant." The court found that several forces contributed to Burns' decision to quit her job: the general working conditions; gossip about the nude photos (and the resulting treatment by co-employees); unwanted sexual advances by Oslac; and the sexually-charged name-calling during the running dispute with other employees about moving and stacking speakers. The district court found "the primary reason [Burns quit] was the incident on the last day during which she and Eugene Ottaway got into a violent name-calling argument and speakers were knocked about."

The district court found that the sexual harassment that Burns received from her co-workers peaked during the second period of employment and resulted from the publication of the nude photos. The court found that there was little or no sexual harassment directed toward Burns by her co-workers during her third period of employment at McGregor. The court found that "[i]n view of [Burns'] willingness to

display her nude body to the public in Easy Riders publications, crude magazines at best, her testimony that she was offended by sexually directed comments and Penthouse or Playboy pictures is not credible." The court stated that it had no doubt that Oslac had made unwelcome sexual advances to Burns during her first two employment periods, but that Burns had exaggerated the severity and pervasiveness of the harassment and its effect upon her. The district court concluded that, in light of the whole record and the totality of the circumstances, Burns had failed to prove "by a preponderance of credible evidence" that the sexual harassment was sufficiently severe or pervasive to alter the conditions of her employment and create an abusive work environment, citing *Meritor Savings Bank v. Vinson*, 477 U.S. 57, 66, 106 S.Ct. 2399, 2405, 91 L.Ed.2d 49 (1986).

Burns appeals, claiming that the district court erred in finding her testimony that she was offended by sexually directed comments and *Penthouse* or *Playboy* pictures not credible because she had posed nude and in finding that the acts of Burns' coworkers were not sufficiently severe or pervasive to create an abusive working environment. McGregor argues that the district court's findings are supported by the record and are correct because the district court could not consider testimony regarding events during Burns' first two periods of employment. It claims that the complaint filed with the E.E.O.C. did not encompass those two periods of employment and that the statute of limitations had run on them.

## II.

■ McGregor contends that the district court could not consider evidence of harassment during the first two periods of Burns' employment. It claims that Burns did not allege in her complaint that she was constructively discharged from McGregor during those two periods and that the E.E.O.C. filing deadline had thus passed on those periods of time. We disagree. Burns' complaint incorporated by reference the E.E.O.C. Right to Sue letter. The Charge of Discrimination attached to the letter stated that "[t]he sexual harassment began two months after the start[2] of [her] employment and [she had] quit several times because of it." Thus, Burns clearly alleged a continuing course of harassment that caused constructive discharge on all three of the occasions she quit work. The periods of time between the employment periods were short, five weeks and three months, respectively. The district court properly considered evidence of harassment during all three periods of employment. Indeed, in considering the "totality of the circumstances," the district court was required to consider all three periods of employment.

## III.

We review a district court's factual findings under the clearly erroneous standard, giving due regard to the opportunity of the trial court to judge the credibility of the witnesses. *See* Fed.R.Civ.P. 52; *Anderson v. City of Bessemer City*, 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985). A factual finding is clearly erroneous if it is not supported by substantial evidence in the record, if it is based on an erroneous view of the law, or if the reviewing court is left with the definite and firm conviction that an error has been made. *Staton v. Maries County*, 868 F.2d 996, 998 (8th Cir.1989). This court may not make an independent determination of the facts and reverse simply because it might have decided the case differently. *O'Connor v. Peru State College*, 781 F.2d 632, 634 (8th Cir.1986). "[W]hen a trial judge's finding is based on his decision to credit the testimony of one of two or more witnesses, each of whom has told a coherent and facially plausible story that is not contradicted by extrinsic evidence, that finding, if not internally inconsistent, can virtually never be clear error." *Anderson*, 470 U.S. at 575, 105 S.Ct. at 1512.

## IV.

The E.E.O.C. guidelines describe harassment creating a hostile work environment

2. On October 14, 1980, the first period of employment.

as "conduct [which] has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment." 29 C.F.R. § 1604.-11(a)(3) (1988). An employer, by creating a hostile environment, forces a woman to "run a gauntlet of sexual abuse in return for the privilege of being allowed to work and make a living." *Meritor,* 477 U.S. at 67, 106 S.Ct. at 2405 (*quoting Henson v. City of Dundee,* 682 F.2d 897, 902 (11th Cir.1982)). Not all harassment rises to the level of an actionable claim. Rather, the conduct must be so severe or pervasive that it creates an abusive working environment. *Id.* (*quoting Rogers v. E.E.O.C.,* 454 F.2d 234, 238 (5th Cir.1971), *cert. denied,* 406 U.S. 957, 92 S.Ct. 2058, 32 L.Ed.2d 343 (1972)). The determination of whether such an environment exists must be made by the trier of fact in light of the totality of circumstances. 29 C.F.R. § 1604.11(b) (1985); *see also Meritor,* 477 U.S. at 69, 106 S.Ct. at 2406; *Hall v. Gus Constr. Co.,* 842 F.2d 1010, 1013 (8th Cir.1988).

▪ Under the totality of the circumstances analysis, the district court should not carve the work environment into a series of discrete incidents and then measure the harm occurring in each episode. Instead, the trier of fact must keep in mind that "each successive episode has its predecessors, that the impact of the separate incidents may accumulate, and that the work environment created may exceed the sum of the individual episodes." *Robinson v. Jacksonville Shipyards, Inc.,* 760 F.Supp. 1486, 1524 (M.D.Fla.1991). "A play cannot be understood on the basis of some of its scenes but only on its entire performance, and similarly, a discrimination analysis must concentrate not on individual incidents but on the overall scenario." *Andrews v. City of Philadelphia,* 895 F.2d 1469, 1484 (3d Cir.1990); *see also Vance v. Southern Bell Tel. & Tel. Co.,* 863 F.2d 1503, 1510 (11th Cir.1989).

▪ To prevail in her sexual harassment claim based on "hostile environment", Burns must show that 1) she belongs to a protected group; 2) she was subject to unwelcome sexual harassment; 3) the harassment was based on sex; 4) the harassment affected a term, condition, or privilege of employment; and 5) McGregor knew or should have known of the harassment and failed to take proper remedial action. *Staton,* 868 F.2d at 998.

▪ The district court found that Burns had satisfied the first, third, and fifth elements of *Staton,* findings that are clearly supported by the record. First, Title VII forbids discrimination on the basis of sex and Burns, as a woman, is a member of a protected group. Second, sexual behavior directed at a woman raises the inference that the harassment is based on her sex. *See, e.g., Huddleston v. Roger Dean Chevrolet, Inc.,* 845 F.2d 900, 904–05 (11th Cir.1988); *Bennett v. Corroon & Black Corp.,* 845 F.2d 104, 106 (5th Cir.1988), *cert. denied,* 489 U.S. 1020, 109 S.Ct. 1140, 103 L.Ed.2d 201 (1989). The record is replete with instances of sexual behavior directed at Burns, such as Oslac's cretinous sexual advances, Ludvik's sexual comments, and Ottaway's obscene name-calling.[3] Thus, the harassment, because of its sexual nature, was based on Burns' sex. Third, the employer clearly knew of the harassment. Oslac is the owner of the plant. Additionally, Burns complained to Martin and Ludvik, both supervisors in the plant, about the harassment from her coworkers; she complained to Kelley about the harassment from Oslac. There is evidence that Oslac knew about the harassment of the coworkers and that he used that harassment to further his own harassment of Burns, telling her that he might just let them get her fired.

The second *Staton* element requires the plaintiff to show that she was subject to unwelcome sexual harassment. The district court had "no doubt" that Oslac made unwelcome sexual advances toward Burns during the first two periods she was employed, but found that there were few opportunities for Oslac to see her during the third period. The court also found that

---

**3.** Additionally, the conduct need not be clearly  sexual in nature. *Hall,* 842 F.2d at 1014.

Burns lacked credibility when she testified that she was offended by the pornographic pictures and by the sexual comments.

The threshold for determining that conduct is unwelcome is "that the employee did not solicit or incite it, and the employee regarded the conduct as undesirable or offensive." *Hall,* 842 F.2d at 1014. The district court's finding that Oslac's advances were unwelcome necessarily required the district court to believe Burns' testimony that Oslac's behavior was offensive to her. Thus, the district court's finding that Oslac made unwelcome advances toward Burns and its finding that Burns was not credible when she stated that Oslac's behavior was offensive appear on their face to be internally inconsistent.

There is no evidence in the record that Burns solicited any of the conduct that occurred. However, the gossip, lewd talk, and the petition all occurred after the nude photographs of Burns appeared. These incidents were incited by the nude photographs and must be considered separately from Oslac's conduct. His conduct occurred both before and after Burns appeared in the magazines and did not change in kind or intensity after the appearance of the photos, though his advances tapered off during Burns' third period of employment. Eugene Ottaway's conduct and that of Burns' supervisors must also be analyzed separately from the conduct that occurred after Burns appeared nude. Ludvik, a plant supervisor, made inappropriate sexual and personal remarks and encouraged Burns to go out with Oslac, both before and after the nude pictures appeared. When Burns complained to supervisors about Oslac's behavior, she received either no response or promises that were not kept. Ottaway, according to the record, knew of the nude pictures and harassed Burns about them, but he also called Burns and other employees names of a sexual nature. Burns' complaints to her supervisor about Ottaway's conduct bore no results. The district court should, on remand, take all of this conduct into account as part of the "totality of the circumstances" in determining whether Burns

found the conduct unwelcome. "The correct inquiry is whether [the plaintiff] by her conduct indicated that the alleged sexual advances were unwelcome[.]" *Meritor,* 477 U.S. at 68, 106 S.Ct. at 2406.

Evidence regarding a plaintiff's sexually provocative speech or dress is relevant "in determining whether he or she found particular sexual advances unwelcome." *Id.* at 69, 106 S.Ct. at 2406. Thus, in making the determination as to whether the conduct directed at Burns was unwelcome, the nude photo evidence, though relating to an activity engaged in by Burns outside of the work place, may be relevant to explain the context of some of the comments and actions directed by Oslac and coworkers to Burns. *See id.* (trier of fact must consider totality of circumstances in determining existence of sexual harassment).

Last, the district court found that the harassment Burns underwent was not so severe or pervasive that it affected a term, condition or privilege of employment. To affect a "term, condition, or privilege" of employment within the meaning of Title VII, the harassment "must be sufficiently severe or pervasive 'to alter the conditions of [the victim's] employment and create an abusive working environment.'" *Id.* at 67, 106 S.Ct. at 2405 (*quoting Henson,* 682 F.2d at 904). The E.E.O.C. guidelines state that conduct is prohibited by Title VII where it "has the purpose or effect of unreasonably interfering with an individual's work performance *or* creating an intimidating, hostile, or offensive working environment." 29 C.F.R. § 1604.11(a)(3) (emphasis added). In approving this language, the Supreme Court cited cases involving racial discrimination and stated that "[o]ne can readily envision working environments so heavily polluted with discrimination as to destroy completely the emotional and psychological stability of [the] workers." *Meritor,* 477 U.S. at 66, 106 S.Ct. at 2405 (*quoting Rogers v. E.E.O.C.,* 454 F.2d at 238). The Court went on to state that "[n]othing in Title VII suggests that a hostile environment based on discriminatory

**566**

*sexual* harassment should not be likewise prohibited." *Id.* (emphasis in original).

 The district court reasoned that a person who would appear nude in a national magazine could not be offended by the behavior which took place at the McGregor plant. It also believed that Burns had exaggerated the severity and pervasiveness of the harassment and its effect on her. Again, these findings are at odds with the district court's finding that Oslac's advances were unwelcome.

We believe that a reasonable person would consider the conduct of Oslac and Burns' supervisors to be sufficiently severe or pervasive to alter the conditions of employment and create an abusive work environment. *See Hall,* 842 F.2d at 1014–17 (similar conduct was sufficiently severe and pervasive as to go "beyond that which even the least sensitive of persons is expected to tolerate"). Burns testified that she was offended by the pictures in the pornographic magazines because they depicted couples engaged in various acts of sexual intercourse. She testified that she found Oslac's sexual advances and Ludvik's and Ottaway's comments humiliating and degrading. Burns continually complained to different supervisors, and she quit three separate times when she could no longer tolerate the conduct. The question is whether Burns has shown she is an "affected individual," that is, whether she was at least as affected as the reasonable person under like circumstances. On remand, the district court must determine whether Burns was as affected as that hypothetical "reasonable person."

Our disposition of this case should not be read as constituting a *de facto* entry of judgment for Burns. *Cf. Legrand v. Trustees of Univ. of Ark.,* 821 F.2d 478 (8th Cir.1987), *cert. denied,* 485 U.S. 1034, 108 S.Ct. 1592, 99 L.Ed.2d 907 (1988). That is not our intention, for we would not presume to substitute our view of the evidence for that of the experienced trial judge, who had the benefit of observing the demeanor of at least some of the witnesses whose testimony was received at trial. Rather, we ask the district court to review the evidence in the light of the considerations we have expressed above. What outcome will flow from those additional findings is for the district court to determine in the first instance.

The judgment is reversed, and the case is remanded to the district court for further findings consistent with this opinion.