**Donna FRED, Plaintiff,**

v.

**WACKENHUT CORPORATION and Omaha Public Power District, Defendants.**

No. 8:CV90–00734.

United States District Court, D. Nebraska.

Aug. 15, 1994.

Noemi Collie, Dallas, TX, for plaintiff.

Judith Batson Sadler, Bruckner & Sykes, L.L.P., Houston, TX, for defendant Wackenhut Corp.

Robert F. Rossiter, Jr., Fraser, Stryker, Vaughn, Meusey, Olson, Boyer & Bloch, P.C., Omaha, NE, for defendant OPPD.

## MEMORANDUM OPINION

STROM, Chief Judge.

This matter was tried to the Court pursuant to 42 U.S.C. § 2000e–5(f)(3), on July 5–8, 11–13, and August 1–2, 1994. After hearing the testimony and examining the exhibits, the Court, pursuant to Fed.R.Civ.P. 52, makes the following findings of fact and conclusions of law.

### BACKGROUND

The parties stipulate that plaintiff was hired by the Wackenhut Corporation (TWC) on February 5, 1989, as a nuclear security officer at the Omaha Public Power District's (OPPD) Fort Calhoun Nuclear Power Station (Station). OPPD had contracted TWC to provide security at the station.[1] Following a four-week training period, plaintiff was certified as a foot patrol and response officer, effective March 6, 1989. However, she lost this status on March 8, 1989, was recertified on March 17, and on April 6, 1989, OPPD withdrew her "unescorted access" to the station until such time as she met certain federal regulatory standards. TWC then suspended plaintiff from duty at the station. Plaintiff was formally served with notice of her termination on June 8, 1989, having never returned to work at the station.

After filing complaints with the NEOC and EEOC and receiving their determinations that no violation of Title VII occurred, plaintiff filed this action. The gravamen of her

---

1. Because each party appears to have exercised joint control and supervision over the security officers, the issue arises as to whether TWC, OPPD or both entities employed the guards. Resolution of this issue is unnecessary because the Court finds no Title VII violation.

complaint is that during and after her tenure at the Station, she was sexually harassed by fellow workers and management of both OPPD and TWC. She further claims that despite her reports of the harassment, her employer failed to take proper remedial action. She alleges that the harassment interfered with the terms and conditions of her employment and ultimately concluded in her termination in violation of Title VII.

## DISCUSSION

Before plaintiff's sexual harassment and discrimination allegations are explored in detail, the Court must initially determine the controlling law in this case. Specifically, the Court must first consider what standards to apply to plaintiff's sexual harassment claim and, second, determine the proper legal framework to analyze her Title VII complaint. The Court addresses these issues in order.

*SEXUAL HARASSMENT*

■ Title VII of the Civil Rights Act of 1964 makes it an "unlawful employment practice for an employer ... to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). The phrase "terms, conditions, or privileges of employment" includes requiring people to work in a discriminatorily hostile or abusive environment. *Meritor Savs. Bank v. Vinson,* 477 U.S. 57, 64, 106 S.Ct. 2399, 2404, 91 L.Ed.2d 49 (1986). When a work environment is permeated with "discriminatory intimidation, ridicule, and insult," that is severe or pervasive enough to alter the conditions of the victim's workplace, Title VII is violated. *Id.* at 65, 106 S.Ct. at 2405; *Harris v. Forklift Sys., Inc.,* — U.S. ——, ——, 114 S.Ct. 367, 370, 126 L.Ed.2d 295 (1993).

■ To establish a Title VII hostile environment claim based on sexual harassment, plaintiff must show:

(1) she belongs to a protected group;

(2) she was subject to unwelcome sexual harassment;

(3) the harassment was based on sex;

(4) the harassment affected a term, condition, or privilege of employment; and,

(5) the employer knew or should have known of the harassment and failed to take proper action.

*Burns v. McGregor Elec. Indus., Inc.,* 955 F.2d 559, 564 (8th Cir.1992) (*Burns I*).

■ Hostile-environment sexual harassment is actionable under Title VII when it is sufficiently patterned or pervasive. *Kopp v. Samaritan Health Sys., Inc.,* 13 F.3d 264, 269 (8th Cir.1993). To make such a determination, the Court must consider the totality of circumstances, including: "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris,* — U.S. at ——, 114 S.Ct. at 371. This is not a "mathematically precise test," *Id.,* and the Court should not pigeon-hole each alleged sexually harassing episode and measure the harm occurring in each incident. *Burns I,* 955 F.2d at 564. "[A] discrimination analysis must concentrate not on individual incidents but on the overall scenario." *Id.* (*citing Andrews v. Philadelphia,* 895 F.2d 1469, 1484 (3d Cir.1990)).

■ The appropriate standard when evaluating the evidence in hostile environment litigation is that of a reasonable woman under similar circumstances. *Burns v. McGregor Elec. Indus., Inc.,* 989 F.2d 959, 962 (8th Cir.1993) (en banc) (*Burns II*). "Thus, behavior a reasonable woman would find objectionable may be actionable even if many people deem it to be harmless or insignificant." *Id.* (citations omitted). Therefore, it is important to note that sexual harassment can occur in many different ways. *Id.* at 964. As the Court stated in *Burns II,* "A female worker need not be propositioned, touched offensively, or harassed by sexual innuendo ... hostility toward women because they are women can obviously result from conduct other than explicit sexual advances." *Id.* at 964 (*citing Hall v. Gus Constr. Co.,* 842 F.2d 1010, 1014 (8th Cir. 1988)).

Therefore, the Court must consider all evidence that suggests a hostile work environment. However, only those incidents of unequal treatment of the plaintiff that would not occur but for the sex of the plaintiff, if sufficiently patterned or pervasive, will be considered as an illegal condition of employment under Title VII. *Hall v. Gus Constr. Co.,* 842 F.2d 1010, 1014 (8th Cir.1988) (*citing McKinney v. Dole,* 765 F.2d 1129, 1139 (D.C.Cir.1985)). The Court must carefully walk what the Supreme Court describes as "a middle path between making actionable any conduct that is merely offensive and requiring the conduct to cause a tangible psychological injury." *Harris,* —— U.S. at ——, 114 S.Ct. at 370. Behavior or language that merely engenders offensive feelings in an employee does not sufficiently affect the conditions of employment to implicate Title VII.

*MIXED MOTIVES FORMULA* [2]

■ Plaintiff has not directed the Court to the theory under which she intended to prove her case, i.e. either under the "mixed motives" approach articulated in *Price Waterhouse v. Hopkins,* 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989), or under the "indirect evidence" analysis in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). The distinction is crucial because of the differences of the burdens of production and proof. Nevertheless, the Court must make a specific finding as to which theory applies to the instant case. *Stacks v. Southwestern Bell Yellow Pages,* 996 F.2d 200 (8th Cir.1993).

The Court finds that the *Price Waterhouse* mixed motives approach is the appropriate theory for this case. Plaintiff has attempted to produce direct and circumstantial evidence that her gender was a motivating factor in her termination. If plaintiff meets her burden by a preponderance of the evidence, the burden of persuasion shifts to the defendants, who must show that they would have made the same decision even if they had not taken gender into account. *Beshears v. As-*

*bill,* 930 F.2d 1348, 1353 (8th Cir.1991). If the defendants meet this burden, they avoid liability. *Price Waterhouse,* 490 U.S. at 244–45, 109 S.Ct. at 1787–88.

Having resolved the principal legal issues of this case, the Court will now examine plaintiff's specific factual allegations.

## ANALYSIS

The Court's inquiry begins with the second *Burns I* component: whether or not plaintiff was subject to unwelcome sexual harassment. *Burns I,* 955 F.2d at 564. If a finding of sexual harassment is made, then the Court will consider whether that harassment was based on sex, whether it affected a condition of employment, and whether TWC or OPPD knew or should have known of the harassment and failed to take proper action. *Id.*

The Court considers the "overall scenario" when analyzing whether plaintiff's workplace was hostile. *Burns I,* 955 F.2d at 564. However, for convenience plaintiff's allegations are considered as they were presented in plaintiff's complaint to the Nebraska Equal Opportunity Commission and with the Equal Employment Opportunity Commission (Exhs. 103, 104, 105, 106): 1) she was handed a styrofoam cup upon which was written sexually suggestive and offensive language, 2) a co-worker advised her that was suspended because she was "not putting out" and 3) she was suspended pending an internal investigation. In her trial brief and during her testimony, plaintiff discussed several additional incidents of conduct that she alleges constitute sexual harassment. The Court will examine these charges in order.

*THE CUP INCIDENT AND OTHER ALLEGATIONS*

■ On March 17, 1989, plaintiff and other security guard trainees were in a training facility on the Station site. At some point plaintiff was presented a styrofoam coffee cup upon which was written the words "Suck my dick Ma-donna" or some such language

---

**2.** The Court notes that the mixed-motivations defense as applied prior to the enactment of the Civil Rights Act of 1991 is controlling in this case. After the Supreme Court's holding in *Landgraf v. USI Film Prods.,* —— U.S. ——, 114

S.Ct. 1483, 128 L.Ed.2d 229 (1994), it is well-settled that the 1991 Act does not apply retroactively to claims actionable prior to the Act's enactment on November 21, 1991.

and equally offensive illustrations. The plaintiff describes her reaction as being "shocked and really disappointed because I felt like I had a lump right in my chest." (Tr. 144).

Other incidents of alleged sexual harassment that occurred before and after the cup incident include a co-worker referring to her as a "civilian" (Tr. 156), being told that she would never be "anything but a fucking guard" (Tr. 163–64), people making distracting noise in the training room (Tr. 515, 519), listening to co-workers make sexist remarks over the Station's intercom system (Tr. 553, 555), being purposely contaminated with radiation, lack of friendly conversation (Tr. 521), hearing the sound of squeaking chairs over the intercom (Tr. 551) and general "behind the scenes abuse" (Tr. 510). During her testimony, plaintiff stated that the sexual harassment continued up until and during the trial itself and plaintiff described the work environment as "day to day harassment" (Tr. 511).

As for the cup incident, the Court concludes that such conduct goes beyond that which is merely offensive, but is instead humiliating and degrading behavior aimed at the plaintiff. The Court acknowledges that the testimony is unclear as to who penned the words and pictures and whether or not plaintiff was handed the cup or if she asked a co-worker if she could see it. Nevertheless, it is unquestionable that the cup existed and that it was inscribed with sexually frank and repugnant material sufficiently offensive to constitute sexual harassment.

Regarding the other allegations, including those raised for the first time at trial but not noted in this opinion, the Court cannot conclude that those incidents constitute sexual harassment. After carefully examining the record and considering the credibility of the witnesses, including the plaintiff's, the Court finds that plaintiff failed to prove that many of her allegations of sexual harassment ever occurred. For those that are supported by some evidence, the Court concludes that they do not rise to the level of sexual harassment as contemplated by the law. For example, other than her bare assertion, plaintiff did not present any evidence to prove a conspiracy existed to intentionally contaminate her with radiation. Another example is her complaint that comments of a sexual nature were made over the Station's intercom system. However, even if they were, there is no evidence that they were ever directed at plaintiff. Indeed, there was credible testimony that during plaintiff's tenure at the Station the intercom system did not even function (Tr. 926) and, in any event, any derogatory language ceased after a memorandum was circulated by plaintiff's superior, TWC Project Manager Larry Jones, advising the guards that such conversations would not be tolerated (Tr. 1222–23; Exh. 1).

■ However, it is unnecessary to engage in a detailed discussion as to why each claim fails for lack of evidence because once defendants were aware of plaintiff's sexual harassment charges, defendants took the requisite prompt remedial action. On March 25, 1989, a meeting for plaintiff's co-workers was called by their superiors, OPPD Security Shift Supervisor Ronald Undajon and TWC Team Leader Tim Boettger. At this meeting, a memorandum was circulated that admonished the employees to cease any harassment (Exh. 22). Plaintiff herself also addressed her co-workers at the meeting and asked them to stop what she considered sexual harassment and that she wanted to be a member of the team (Exhs. 61 & 35). Undajon told the guards that he would not tolerate sexual harassment at the Station (Tr. 173–74).

The Court concludes that this meeting and the accompanying memorandum was proper, effective and sufficient remedial action to stop further sexual harassment and, therefore, TWC and OPPD did take proper action as required by *Burns I*. Indeed the evidence shows that once the defendants were made aware of plaintiff's claims, they called the March 25 meeting and circulated the memorandum and no additional sexual harassment was reported. Although plaintiff argues that the harassment continued after the meeting, there was no credible evidence of continued harassment presented to the Court. Indeed, the effectiveness of the meeting and the memorandum is underscored by plaintiff's own testimony during

cross examination. In response to a question concerning why the guards no longer made sexually oriented remarks over the intercom, plaintiff stated "They were afraid to lose their jobs" (Tr. 640).

The Court therefore concludes that but for the cup incident on March 17, no other episodes of sexual harassment occurred at the Station. Consequently, the Court finds that the harassment was not severe or pervasive enough to alter the conditions of the workplace. Furthermore, the Court concludes that any sexual harassment was arrested by the prompt remedial action taken by OPPD and TWC through the March 25 meeting.

*PLAINTIFF'S SUSPENSION*

■ Plaintiff alleges that her suspension from duty on April 6, 1989, constitutes sexual harassment. According to plaintiff, on the morning of April 6, she was "counselled" or disciplined by Boettger for her repeated failure to follow the organizational chain of command, for not providing TWC with a contact telephone number, and for her failure to meet with her fellow team members as she had been instructed to do. He presented her with a "Record of Formal Counselling" (Exh. 36), a form of disciplinary report, detailing these problems for her signature. Plaintiff denied the allegations, refused to sign the report and threatened to give it to the Better Business Bureau (Exh. 37). Plaintiff alleges that Boettger repeatedly "hollered" at her to "shut up" and would not listen to her excuses for the violations included in the report (Tr. 212–221).

Plaintiff contends that she then went to talk to Undajon, who, according to plaintiff, read Boettger's counselling form, told plaintiff to "shut up" and had her removed from his office by two guards (Tr. 224). Undajon "deactivated" her security badge, which effectively terminated her unescorted access to the Station.

Finally, Jones was advised by Undajon that plaintiff's badge was deactivated. Jones then told plaintiff that she was suspended pending an investigation and that she should go home (Tr. 228).

During her conversations with Boettger, Undajon and Jones, plaintiff contends that she behaved in a quiet, straightforward and professional manner.

However, according to Boettger, plaintiff refused to follow instructions to sit down and she became "totally irrate [sic] and irrational" and began to rant (Exh. 22). Undajon noted that when he spoke to plaintiff she was "uncontrollable, that she was yelling, and that she would not sit down and discuss the problem, [and] she started 'ranting and raving'" (Exh. 101 p. 9). In her meeting with Jones, plaintiff was argumentative, insubordinate and refused to accept Jones' decision to suspend her because OPPD deactivated her badge (Tr. 1229, Exh. 32).

Plaintiff claims that this series of events, including the actual suspension from her position, constitutes a cognizable sexual harassment claim.

The Court recognizes that sexual harassment can occur in many ways other than through explicit sexual advances, *Burns II,* 989 F.2d at 964. However, even if the Court accepts plaintiff's version of events on the morning of April 6, 1989, the Court must still conclude that there is no evidence to support the contention that plaintiff's suspension constituted sexual harassment. There is absolutely nothing in the record to even suggest that the deactivation of her badge and her eventual suspension were motivated by anything other than the violations noted in the Record of Formal Counselling and her behavior during her meetings with Boettger, Undajon and Jones. Although plaintiff may not feel that the violations in the Record of Formal Counseling were justified, this Court is not the forum to debate the judgment of plaintiff's superiors. The record is replete with evidence that plaintiff's behavior on April 6, and not sexual harassment, made it incumbent upon TWC and OPPD to disarm and remove plaintiff from the Station.

*SEXUAL PROPOSITIONS*

■ Finally, plaintiff alleges that another episode of sexual harassment occurred April 10—four days after her suspension—when a former co-worker, Arthur L. Marr, advised her during a telephone conversation that she was having problems at work because she was "not putting out." She also claims that

he stated that "him [sic] and his wife had an open relationship and that their relationship was such that they had 'casual sex' and he was suggesting that I have casual sex" (Tr. 315–16).

No corroborating evidence or testimony was adduced at trial other than her lone accusation. Marr himself emphatically and categorically denied that he propositioned or otherwise discussed sex with plaintiff (Tr. 289–90). The Court finds that plaintiff's claims regarding Marr are wholly unsubstantiated.

In addition, plaintiff claims that this conversation occurred many days after her suspension while she was at home. There is no evidence of any improper remarks or conduct by Mr. Marr at the workplace. In fact, the plaintiff and Mr. Marr were on different teams. Even accepting the notion that the exchange occurred, the Court finds that Marr's alleged sexual proposition did not affect her in her workplace.

For these reasons, the Court concludes that plaintiff's allegations against Marr are not credible nor relevant to the issues and they will therefore not be considered as an episode of sexual harassment.

*PLAINTIFF'S TERMINATION*

█ It is important to note that even if the Court concluded that plaintiff was successful in showing that gender played a part in her suspension and subsequent termination, under the rule articulated in *Price Waterhouse,* the Court would be obligated to find for the defendants. Thus, even if plaintiff met her burden, defendants would avoid liability if they demonstrated that they would have made the same decision even if they had not taken gender into account. *Price Waterhouse,* 490 U.S. at 244–45, 109 S.Ct. at 1787–88.

This burden could be easily satisfied by defendants. Under 10 C.F.R. § 73 App. B, specific physical and mental standards are required by the Nuclear Regulatory Commission. That Part states, in pertinent part:

2. Mental qualifications:

b. Armed individuals and central alarm station operators ... shall have no emotional instability that would interfere with the effective performance of assigned security job duties. The determination shall be made by a licensed psychologist or psychiatrist, or physician, or other person professionally trained to identify emotional instability.

After plaintiff's suspension on April 6, she underwent a psychological examination conducted by a licensed clinical psychologist, Dr. James M. Burger, Ph.D. He prepared a profile of plaintiff which concluded that she had (1) Argumentative Hostility Toward Authority, (2) Adverse Reaction to Stress, and (3) Emotional and Personal Inadaptability (Exh. 88). His findings were confirmed by a colleague, Dr. Caroline G. Sedlacek, Ph.D., who concluded that "Mrs. Fred cannot handle the type of responsibility and team work required at the nuclear plant.... I suppose one could build a strong case for a mixed personality disorder" (Exh. 87). On the basis of his conclusions and those of Dr. Sedlacek, Dr. Burger would not certify plaintiff was competent to discharge her duties as an armed security officer (Exh. 38). Consequently, plaintiff was terminated on June 8, 1989.

Thus, pursuant to 10 CFR § 73 App. B, plaintiff was unfit for duty and TWC's only option was to terminate her as an armed security officer at the Station or risk violating the Nuclear Regulatory Commission's rules. Therefore, even if plaintiff had met her burden, the evidence established that they would have terminated her.

**CONCLUSION**

For these reasons, the Court finds that plaintiff has failed to established her claim that she was subject to a discriminatorily hostile or abusive work environment or that her gender played a part in defendants' decisions which led to the termination of her employment. A separate order will be entered in accordance with this memorandum opinion.