**BENNY M. ESTES AND ASSOCIATES, INC., Appellee,**

**v.**

**TIME INSURANCE COMPANY, Appellant.**

No. 91–2809.

United States Court of Appeals, Eighth Circuit.

Submitted June 10, 1992.

Decided Dec. 3, 1992.

Jordan B. Cherrick, Little Rock, Ark., argued (David A. Hodges, on the brief), for appellant.

Brooks A. Gill, Dumas, Ark., argued, for appellee.

Before RICHARD S. ARNOLD, Chief Judge, HENLEY, Senior Circuit Judge, and MAGILL, Circuit Judge.

RICHARD S. ARNOLD, Chief Judge.

This case arises out of an agreement between Time Insurance Company and Benny Estes to do business in the individual medical-insurance market. Time engaged Estes and his newly formed company, Estes and Associates, to create a network of "sub-agents" to distribute Time's product. Within several years of its creation, however, this relationship began to sour. In 1989, Benny Estes's corporation, frustrated by what he perceived as tortious interference by Time with the contracts with the sub-agents, initiated this suit. In May of 1991, the jury returned a verdict in favor of Estes for $300,000 in actual and $1,700,000 in punitive damages. The District Court[1] denied Time's post-trial motions on August 1, 1991, and this appeal followed. We affirm.

I.

Benny Estes has been an insurance salesman in Arkansas for many years. In early 1980, Estes became a soliciting agent for Time. He was licensed by Time until 1983, when a shift in policy led to his termination. Despite his termination, however, Estes maintained contact with Time. He was rewarded for his efforts with a general agent's contract in March of 1984. Early that same year, Rod Wood, Time's regional sales manager for Southern Arkansas, contacted Estes with the idea that he join with Time to help it cultivate a network of sub-agents across the State.[2] Estes was attracted to this proposition, but had reservations. In an effort to smooth over any difficulties, Wood gave Estes an oral promise that Time would not promote any of his sub-agents to general agents without first getting Estes's approval. The purpose of this agreement was to protect Estes from investing his time, money, and effort in training these sub-agents and developing his business, only to have Time come in and promote the sub-agents to

1. The Hon. Susan Webber Wright, United States District Judge for the Eastern and Western Districts of Arkansas.

2. Briefly stated, the distribution process for Time's insurance policies works as follows. The State of Arkansas is divided into four regions. Three of those regions, the Southern, the Northwestern, and the Northeastern, are assigned regional sales managers. The fourth region, which includes Pulaski County and Little Rock, is open to all three of the regional managers. The regional sales managers are responsible for recruiting, training, and providing services to the general agents within their territories.

The general agents are in a direct contractual relationship with Time. They act as intermediaries between the regional manager and the sub-agents with whom they do business. The sub-agents are in a direct contractual relationship with a general agent and are responsible for selling Time's product. A sub-agent may be promoted to a general agent with the approval of Time.

general agents and, in the process, severely undermine his business. After being given this oral assurance, Estes agreed to have his insurance agency, Estes and Associates, licensed as a general agent for Time.

The relationship proceeded smoothly for several years. Estes and Associates entered into sub-agent contracts with numerous agents across Arkansas. While the sub-agents' contracts did not mention Time, the primary purpose for their hiring was to market Time policies. By the end of 1985, Estes had recruited over 80 sub-agents and was beginning to net modest profits.

In April of 1988, Richard Smith, Time's regional sales manager for Northeastern Arkansas, began a direct-mail campaign to recruit new general agents in his territory. Among the 170 letters sent by Smith were several which reached Estes and Associates sub-agents. As a result of this campaign and the efforts of Smith, several of Estes's sub-agents cancelled their contracts with him and entered into general-agent contracts with Time.

When Estes discovered these actions, he made strong protests to Time. Estes complained that Smith's actions had violated the terms of his oral agreement with Time that his sub-agents would not be promoted without his consent. He pointed out that Time had ratified this agreement by reversing some of Smith's promotions in 1984.[3] Bill Bales, Rod Wood's successor as regional manager for Southern Arkansas, echoed these concerns in a memorandum to Time's home-office staff in Milwaukee, Wisconsin. Despite these complaints, however, Time did not prevent Smith from following his course of action. In 1989, with the loss of two more sub-agents and subsequent accounting problems relating to the crediting of a policy sold by Steve Wessell (a sub-agent licensed both by Benny Estes and another agency which Smith had recruited), Estes ended his recruitment operations and filed this suit.

At trial, both sides presented evidence relating to Time's relationship with Estes

and Associates. Estes presented evidence that Time had ratified Rod Wood's oral promise that Estes's sub-agents would not be promoted without Estes's approval. In addition, Estes presented evidence that Smith had targeted Estes's sub-agents for promotion, that Smith had used pressure and intimidation to try to get the agents to switch alliances, that Smith falsely told the sub-agents that Estes was being phased out of Time's operations, and that he (Smith) would notify Estes of their switch. Time countered with evidence to show that the sub-agents made voluntary and unpressured moves designed to better their careers through becoming general agents. In addition, Time presented evidence which showed that the sub-agents in question generated roughly $40,500 for Estes and Associates while working with Benny Estes, and that they had earned roughly $47,000 since becoming general agents. The amount of money which Estes earned from these agents was approximately $4,000 per year.

After hearing this evidence, the jury found that Time had tortiously interfered with Estes's business. The jury awarded Estes $300,000 in actual damages and $1,700,000 in punitive damages. On this appeal, Time raises three claims. It argues that (1) Estes and Associates failed to prove a claim for tortious interference with a third-party contract or business expectancy, (2) a new trial should be ordered because the actual damages were based on speculative and inadmissible evidence, and (3) a judgment notwithstanding the verdict should be granted as to the punitive damages because the $1,700,000 award did not meet the due-process standards set by the Supreme Court in *Pacific Mutual Life Insurance Co. v. Haslip*, —— U.S. ——, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991), and because the award was, in any case, excessive. We reject these arguments and affirm the judgment of the District Court.

---

**3.** Richard Smith had apparently interfered with Estes's operations on at least one prior occasion. In 1984, Smith recruited three of Estes's sub-agents to become general agents in his region. When Estes learned this, he complained to Rod Wood. Wood, in turn, brought Estes's com-

plaints to the attention of Time's upper-level management, which reversed the decision to make these sub-agents general agents, and returned them to Estes and Associates. One of these disputed sub-agents, Bobby Whitfield, was a sub-agent Smith pursued anew in 1988.

## II.

### A.

Time's first focus is on the specific theory under which Estes and Associates seeks to recover. Relying upon *L.L. Cole & Son, Inc. v. Hickman*, 282 Ark. 6, 665 S.W.2d 278 (1984), Time argues that this action is properly only a breach-of-contract suit and therefore tort damages are not available. It argues that the basis of this dispute is the oral agreement between Rod Wood and Benny Estes, and that any damages which Estes suffered were the result of Time's failure to adhere to that agreement. However, the conduct of a defendant may support both an action in tort and an action for breach of contract. In such a situation, the responsibility falls upon a plaintiff to plead and prove its case in tort. *L.L. Cole*, 282 Ark. at 9–10, 665 S.W.2d at 280–81. Arkansas law recognizes that persons may sue for tort damages when their business has been tortiously interfered with by a third party. See, *e.g., Jim Orr and Associates, Inc. v. Waters*, 299 Ark. 526, 531, 773 S.W.2d 99, 102 (1989). In so recognizing, the *Jim Orr* Court noted that "[t]he fundamental premise of the tort—that a person has the right to pursue his valid and contractual business expectancies unmolested by the wrongful and officious intermeddling of a third party—has been crystallized and defined in Restatement, Torts § 766." *Ibid.* (quoting *Walt Bennett Ford, Inc. v. Pulaski County Special School Dist.*, 274 Ark. 208, 213, 624 S.W.2d 426, 429 (1981)). Estes and Associates introduced sufficient evidence to support a cause of action in tort. A rational jury could believe that Time and its agents unjustifiably interfered with Estes's contracts with sub-agents.

### B.

Time next argues that Estes and Associates cannot maintain a tortious-interference suit because there was no third-party interference in this case. Time asserts that it, Estes and Associates, and the sub-agents were interconnected in a business relationship, and that as a result, any conduct on the part of Time or its officers in dealing with the sub-agents was not the outside interference necessary to support this claim.

Although this argument is attractive on its surface, we think it misses the point. While Estes and Associates and its affiliated sub-agents marketed Time's product, Time was not a party to any sub-agent's contract. The sub-agents were contractually obligated only to Estes and Associates. In this situation, action on the part of Time to induce Estes's sub-agents to leave his employ could properly be viewed as third-party interference in an existing business relationship.

Time cites two cases to support its view. In *Navorro–Monzo v. Hughes*, 297 Ark. 444, 763 S.W.2d 635 (1989), the Arkansas Supreme Court held that there was no tortious interference by a third party when a corporate director interfered with another corporate director's employment. In that case, however, both parties worked for the same entity, the corporation, and the contract that was interfered with was the director's contract with the corporation itself. As a result, there were only two parties involved. In this case, we are presented with three separate entities: the sub-agents, Estes and Associates, and Time. While these parties may be interconnected through business, they are not contractually bound to each other. There are separate contracts between the sub-agents and Estes and Associates, and between Estes and Associates and Time. There is no contract between Time and the sub-agents.

*Cutter v. Lincoln National Life Insurance Co.*, 794 F.2d 352 (8th Cir.1986), is also inapposite. In that case, decided under South Dakota law, the plaintiff, a former sales agent for the defendant, sued for tortious interference based upon the actions of a company agent in soliciting clients of hers to have their policies rewritten to exclude her name. Regardless of the propriety of that agent's actions, this Court held that there was no third-party interference because the plaintiff had no contract of her own with the insurance buyers the agent interfered with. Any

contract that she had with the insureds was based upon her employ with the insurance company. She did not have a separate, individual contract with the insureds, but they did have a contract with the company. In the present case, while the sub-agents marketed Time's product, they were not in a contractual relationship with Time. The only contract Time entered into in this case was with Estes and Associates. Thus, Time was legally capable of tortiously interfering with the relationship between Estes and Associates and its sub-agents.

### C.

Time's third argument is that Estes and Associates may not succeed in a tortious-interference suit because these sub-agents were "at-will" employees. Time argues that the sub-agents, as well as Estes and Associates, could end their relationship with each other for any reason and at any time, provided that there was written notice. As a result, Estes and Associates could not expect these sub-agents to work for any given length of time. Because of this indefinite relationship, the termination of their contracts cannot support a claim for third-party interference.

In support of this argument, Time cites *Donathan v. McDill*, 304 Ark. 242, 800 S.W.2d 433 (1990). In that case, the plaintiff, who was seeking to purchase some land, hired the defendant to help him find an appropriate plot. 304 Ark. at 243, 800 S.W.2d at 433. After locating the land at a foreclosure sale and having Donathan's bid accepted, the defendant, who had bid against the plaintiff, blocked the sale of the land by talking the original owner into exercising his right to repurchase the land through paying back taxes. The defendant then bought the land from the owner. 304 Ark. at 243, 800 S.W.2d at 434. The Arkansas Supreme Court held that these actions did not amount to tortious interference because the plaintiff's only expectancy, which was won by submitting the highest bid, was the right to purchase the land *if* the owner chose not to redeem it. 304 Ark. at 243–44, 800 S.W.2d at 434. The actions of the defendant did not interfere with that expectancy.

We find the Arkansas Supreme Court's reasoning in *Mason v. Funderburk*, 247 Ark. 521, 446 S.W.2d 543 (1969), more closely in point. In that case, a case which focused specifically on tortious interference with an at-will contract, the Court stated:

> The theory allowing the recovery of damages for unlawful interference with contractual relationships will also support the recovery of damages from one who, without a privilege to do so, induces or otherwise purposely causes a third person not to enter into or continue a business relation with another, at least where the means of inducement are tortious.... This rule applies to situations in which a party induces or otherwise purposely causes another not to employ a third person as well as the situation in which the party induces or purposely causes an employer to terminate a relationship with an employee, *even though the employment was at will....* It has long been recognized in many American jurisdictions that one who, maliciously and without justifiable cause by means of false statements, threats or putting in fear or, perhaps, by means of malevolent advice or persuasion, induces an employer to discharge an employee is liable in an action of tort to the employee for the damages thereby sustained, *regardless of whether the employment was for an unexpired fixed term or terminable at will of the employer....*

247 Ark. at 525–26, 446 S.W.2d at 546 (citations omitted) (emphasis ours). We have adhered to this view of Arkansas law. See, *e.g.*, *City Nat'l Bank of Fort Smith v. Unique Structures, Inc.*, 929 F.2d 1308, 1315–16 (8th Cir.1991). Thus, we reject Time's argument that Estes and Associates failed to make out a claim for tortious interference with a third-party contract or business expectancy.[4]

### III.

Time next challenges the actual damages awarded to Estes and Associates. Time argues that Estes and Associates' claims that Time had destroyed its business were not supported by substantial evidence. In addition, Time argues that the jury should not have been allowed to consider the evi-

---

**4.** Time also argues that its actions taken with regard to the sub-agents were "privileged"

dence regarding the promotion of sub-agent Billy Joe Bailey because this evidence was barred by the three-year statute of limitations under Arkansas law. Because the jury was allowed to consider this evidence, Time argues, the verdict should be overturned. We disagree.

■ Time asserts that the actual damages recoverable in this action can be no greater than those recoverable in a breach-of-contract action. Under this analysis, Estes and Associates would not be entitled to damages for the destruction of its business absent a showing that the parties had contemplated these damages at the time the contract was entered into. Time relies on *Mahoney v. Roberts,* 86 Ark. 130, 110 S.W. 225 (1908), and *Prosser and Keeton on the Law of Torts* to support this theory. It argues that "[w]here substantial loss has occurred, one line of cases tends to adopt the contract measure of damages, limiting recovery to those damages which were within the contemplation of the parties when the original contract was made." Keeton, Dobbs, Keeton, and Owen, *Prosser and Keeton on the Law of Torts* § 129, at 1003 & n. 65 (5th ed. 1984). While Prosser asserts that *Mahoney* supports this view, we are not inclined to hold that this authority forecloses Estes and Associates' attempt to recover damages in this case.

Several factors lead us to this conclusion. First, *Mahoney,* which was decided in 1908, has not been cited by subsequent Arkansas Supreme Court decisions as support for the proposition that damages in an action for tortious interference with an existing contract are limited to the damages one could recover under a breach-of-contract theory. Secondly, later Arkansas Supreme Court cases have held that a plaintiff in a tortious-interference action may recover punitive damages. *E.g., United Bilt Homes,*

*Inc. v. Sampson,* 310 Ark. 47, 832 S.W.2d 502 (1992). An award of punitive damages indicates that damages are not limited strictly to those recoverable in a breach-of-contract action. It would follow that in a tortious-interference action "a person who induces one of the parties to a contract to break it is liable to the other party *for any damages resulting from such breach." Wakin v. Wakin,* 119 Ark. 509, 515, 180 S.W. 471 (1915) (McCulloch, C.J., dissenting) (emphasis ours). Indeed, the Prosser treatise, in its discussion on damages, lists the cases which allow for punitive damages separately from the class of authorities into which it places *Mahoney.* We see nothing in Arkansas law which prohibits Estes and Associates from recovering the actual damages that it was awarded.

■ Time also argues that the jury was improperly influenced by the evidence pertaining to Estes's sub-agent Billy Joe Bailey. Bailey's departure from Estes and Associates and his acceptance of a general agent's contract with Time, took place in 1985. Because Arkansas has a three-year statute of limitations for this action, Time argues that the evidence pertaining to Bailey was time barred. The District Court disagreed, holding that although the suit was filed more than three years after Bailey was promoted, Time had concealed his transfer, thus tolling the statute of limitations until Estes and Associates discovered the change.

Time seeks to overturn the verdict because it could have conceivably been based entirely upon the evidence pertaining to Bailey, as opposed to the other sub-agents. Assuming that this evidence was improperly submitted to the jury, however, we can find no indication that it impermissibly affected the jury in its calculation of damages in this case. During the course of the trial, Estes and Associates presented evidence to the jury detailing a pattern of conduct on the part of Time and Richard

under Arkansas law. Under this theory, "a defendant will not be liable if he acts, without bad faith, to protect the public interest or a third person to whom he stands in a relation of responsibility." *Conway Corp. v. Construction Engineers, Inc.,* 300 Ark. 225, 233, 782 S.W.2d 36, 40 (1989), *cert. denied,* 494 U.S. 1080, 110 S.Ct. 1809, 108 L.Ed.2d 939 (1990). It is possible, however, for a party to negotiate away or waive this "privilege." In this case, we hold that there was sufficient evidence for the jury to find that Time, through the oral assurances given by Rod Wood, waived its right to promote these sub-agents without the express consent of Benny Estes.

Smith designed seriously to undermine its ability to perform. The focal point of this evidence was the testimony pertaining to the sub-agents whom Time promoted without consulting Benny Estes. On the strength of this evidence, Estes and Associates argued that Time tortiously interfered with its existing business. Arkansas law follows the general rule that when a case is submitted to the jury for a general verdict, with an improper element of damages included, the Court will not reverse the jury's decision simply because that improper element was included. *Jefferson Hosp. Ass'n, Inc. v. Garrett,* 304 Ark. 679, 681, 804 S.W.2d 711, 712 (1991). The courts will not assume that the jury awarded damages for that particular element. *Id.*

Time argues that this Court should follow *Todd Farm Corp. v. Navistar Int'l Corp.,* 835 F.2d 1253, 1257 (8th Cir.1987), which holds that when a case is submitted to the jury with the inclusion of an impermissible *theory,* the jury's verdict will not be allowed to stand. The difference in the present case is quite clear. We are not faced with a situation where the jury was given an opportunity to consider an impermissible theory of recovery. The case was submitted under only one theory, that Time tortiously interfered with the business dealings between Estes and Associates and its sub-agents. The present case is akin to the situation confronted in *Jefferson Hospital.* That is, one of the eight sub-agents who signed a general agency contract with Time *may have done so* outside the three-year statute of limitations contained in Arkansas law. The most that can be said for the jury's consideration of the evidence pertaining to Bailey is that it was part of a long list of evidence which the jury could have relied upon to reach its verdict. Thus, we hold that any error in submitting the evidence pertaining to Billy Joe Bailey to the jury has not been shown to be prejudicial,

and that the jury's award of $300,000 in actual damages should stand.[5]

## IV.

Time's last arguments focus on the award of $1,700,000 in punitive damages. Time argues that it is entitled to a judgment notwithstanding the verdict on the punitive-damage award because it did not meet the due-process requirements of *Pacific Mutual Life Insurance Co. v. Haslip,* — U.S. —, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991). In the alternative, Time argues that this Court should order a substantial remittitur or new trial because of "the jury's 'excessive' and 'plainly unjust' $1,700,000 punitive damages award." Appellant's Brief 58.

Time argues that the award of punitive damages in this case violates the Due Process Clause of the Fourteenth Amendment, as interpreted by the Supreme Court of the United States in *Pacific Mutual Life Insurance Co. v. Haslip,* — U.S. —, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991). The violation is twofold, substantive and procedural, Time says. First, it is asserted that the jury instruction given in this case, Arkansas Model Instruction (AMI) 2217, was constitutionally defective for two reasons: it did require the jury to consider the nature and character of the defendant's conduct, and it allowed the jury to consider the defendant's net worth. Second, Time argues that the procedures available for review of the jury verdict, both in the trial court and on appeal, are insufficient to satisfy the procedural requirements of the Due Process Clause.

This Court has thoroughly considered and recently rejected these arguments. *Robertson Oil Co., Inc. v. Phillips Petroleum Co.,* 979 F.2d 1301 (8th Cir.1992). The jury instruction given in this case is the same instruction that the trial court gave in *Robertson,* and the *Robertson* court has held "that the instruction given was comparable to that approved in *Haslip....*"

---

5. Time also argues that there was insufficient evidence to support Estes and Associates' assertion that the actions of Time resulted in the destruction of its business. We hold that there was sufficient evidence from which the jury could conclude that Time's ability to promote Estes's sub-agents without his consent resulted

in the destruction of a business which Rod Wood himself had said could generate premiums of $500,000 per year. In short, without a viable assurance that its employees would remain with the company, Estes and Associates would never be able to attain the goals which prompted it to join the venture in the first place.

*Robertson,* 979 F.2d at 1306, citing a previous opinion in the same case, *Robertson Oil Co., Inc. v. Phillips Petroleum Co.,* 930 F.2d 1342, 1347 (8th Cir.1991). We note, in addition, that the District Court in the present case, when it gave AMI 2217 to the jury, stated that Estes had the burden of proving that Time "intentionally pursued a course of conduct for the purpose of causing damage." Thus, the jury was required, in substance, to consider the nature and character of Time's conduct, though not, perhaps, in the detailed way for which Time now contends.

As to consideration of Time's net worth, the jury was not told that this factor was relevant to the decision whether to award punitive damages, but only "[i]n arriving at the amount of punitive damages...." Appellant's Add. at A–24. This is exactly what juries have traditionally done in punitive-damages situations. It is true that the Alabama system approved in *Haslip* is different, in that, in Alabama, the jury is not told a defendant's net worth until it has decided that punitive damages should be awarded in *some* amount. However, the Supreme Court's opinion in *Haslip* did not hold that the Due Process Clause is violated unless each aspect of the Alabama procedure is followed. It held only that the Alabama procedure, if followed, does not violate due process. This is quite different, and leaves the way open to a holding that other systems, like the Arkansas system under consideration here, also comply with the Constitution, though they differ from the Alabama approach.

Time's procedural argument is also fully addressed in the recent *Robertson* opinion, and in this respect the *Robertson* panel was unanimous. See *Robertson,* 979 F.2d at 1314 (Beam, J., dissenting) ("I agree with the district court's analysis of the scope of judicial review of punitive awards under Arkansas practice.").

■ Time further argues, citing *Mattison v. Dallas Carrier Corp.,* 947 F.2d 95 (4th Cir.1991), that it doesn't really matter what procedures are available under Arkansas law for post-verdict review of awards of punitive damages. Under the Seventh Amendment, the argument runs, a federal court's review of a jury award is limited, and only those criteria that were actually given to the jury in instructions can be used for purposes of this review. Thus, review under the Seventh Amendment and Fed.R.Civ.P. 59 is less thorough than the review customarily undertaken by Arkansas state courts. The argument seems a curious one. Essentially, it asserts that the Seventh Amendment requires a form of post-verdict review that violates the Fourteenth Amendment, or maybe it's the Fifth. In any case, this argument too is fully answered in the *Robertson* opinion. 979 F.2d at 1306. At least in Arkansas, state law does not create any form of review of verdicts for punitive damages that is different from that permitted by federal law. *Id.* at 1306.

Accordingly, we reject Time's constitutional challenges to the award of punitive damages in this case.

■ As to the claim that this Court should order a remittitur or new trial based upon the size of these damages, Time asserts that a $1,700,000 award is plainly excessive in light of the $300,000 that Estes and Associates recovered in actual damages. In determining whether remittitur is proper, we must focus on whether "the verdict is so grossly excessive as to shock the court's conscience." *American Business Interiors, Inc. v. Haworth, Inc.,* 798 F.2d 1135, 1146 (8th Cir.1986). We "will reverse a denial of remittitur only when in rare circumstances we are pressed to conclude that the verdict represents a monstrous or shocking injustice." *Id.* In reviewing the District Court's actions, we operate under the clear-abuse-of-discretion standard.

■ In this case, the jury was presented with a volume of evidence which, if believed, would justify the imposition of $1,700,000 in punitive damages upon Time. First, there was evidence that Time's regional sales manager, Rod Wood, had entered into an agreement with Benny Estes that Time would not promote his sub-agents absent his consent. The jury could have found that the reason for procuring this agreement was to protect a business venture Estes was entering into at the behest of Time. Additionally, the jury could have found that Richard Smith, a regional sales manager for Time, willfully and inten-

tionally sought to circumvent this agreement, despite his knowledge of its existence, and specifically target Benny Estes's sub-agents for his own organization.

The jury was also presented with evidence detailing Smith's conduct towards the sub-agents in his attempts to procure their services. For instance, the jury could have found that Smith used various forms of pressure and intimidation to get the sub-agents to switch allegiances. It could have also found that Smith deliberately misled these sub-agents by telling them that Estes and Associates was being phased out and that the sub-agents had no choice but to accept his offer. Finally, the jury could conclude that this conduct was calculated to undermine Estes and Associates' business to the point that it could no longer remain viable. Under Arkansas law, the purpose of punitive damages is not to compensate the plaintiff, but to punish "conduct which is malicious, wanton, in violation of a relationship of trust or confidence, or which is done with deliberate intent to injure another." We cannot say that the present verdict is so excessive as to necessitate a remittitur. See *Interstate Freeway Services, Inc. v. Houser*, 310 Ark. 302, 310, 835 S.W.2d 872, 876 (1992).

Affirmed.