# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 09-3367

_____

Sheri Sheriff,

        Plaintiff – Appellee,

    v.

Midwest Health Partners, P.C.,
a Nebraska Professional Corporation;
Midwest OB-GYN Clinic, P.C.,
a Nebraska Professional Corporation,

        Defendants – Appellants.

\*
\*
\*
\*
\*
\* Appeal from the United States
\* District Court for the
\* District of Nebraska.
\*
\*
\*
\*
\*

_____

Submitted: June 15, 2010
Filed:  August 30, 2010

_____

Before MURPHY, BEAM, and BENTON, Circuit Judges.

_____

MURPHY, Circuit Judge.

Sheri Sheriff brought this action against her employers, Midwest Health Partners, P.C. and Midwest OB–GYN Clinic, P.C. (collectively Midwest), alleging hostile work environment and constructive discharge in violation of Title VII and gender discrimination in violation of state law.  After the district court[1] directed a

_____

[1]The Honorable Thomas D. Thalken, United States Magistrate Judge for the District of Nebraska.

verdict in favor of Midwest on Sheriff's state law claim, a jury found in her favor on her hostile work environment claim and awarded her $100,000 in compensatory damages. Midwest appeals, contending that there was insufficient evidence to support her verdict and that the damage award was excessive. We affirm.

I

Sheriff, a licensed physical therapist, was hired by Midwest in September 2003 to open and run a physical therapy department at a recently acquired chiropractic clinic. The relevant facts are recounted here in the light most favorable to Sheriff due to the verdict in her favor on her hostile work environment claim. Wilson v. City of Des Moines, 442 F.3d 637, 639 (8th Cir. 2006).

After she began to work at the clinic in September 2003, one of the chiropractors, Dr. Curtis Meyer, acted towards her in ways which made her uncomfortable. Dr. Meyer began to touch her and put his arm around her. At first she was afraid to report his behavior because she depended upon the chiropractors for patient referrals. Without such referrals health insurance providers would not cover physical therapy. She tried to "guard" herself from Meyer's unwelcome advances by keeping her distance from him, but she was unable to evade all of his embraces. She testified that she felt humiliated when he pulled her against his body but that she felt powerless to stop or confront him. When Sheriff told one of the Midwest nurses about her problem with Meyer, the nurse told her to "get used to it, [because] that's just the way he is."

An incident on March 17, 2005 finally caused Sheriff to report Meyer's conduct to management. On that day she purchased coffee for the clinic employees, and when she was alone in her office Meyer came in and kissed her on the forehead. His kiss made her feel "horrible" and "very violated" and she went to

-2-

see Brenda Proffitt, Midwest's Practice Manager. She reported the kiss incident as well as Meyer's previous physical advances.

Sheriff then drafted a letter to Meyer which Proffitt reviewed and approved. In the letter Sheriff told Meyer:

> I have never given you any indication that it is okay to touch or kiss me. It is NOT okay! . . . . I have been on-guard around you for so long anyway[], as I have never felt comfortable the way you put your arm around me and squeeze my side . . . . I do not want you to touch or kiss me again. . . . I hope this does not affect our professional relationship. I want to address this situation . . . and move on.

Meyer received Sheriff's letter on March 22. He immediately apologized to her and assured her he would never again kiss or embrace her. Sheriff accepted his apology and told Proffitt, "As far as I am concerned, it has been taken care of. If you and [Midwest president] Dr. Vrbicky are okay with it, I do not need you to talk to him on my behalf."

Although Dr. Vrbicky was aware that a patient at Meyer's prior clinic had complained about his inappropriate conduct, no one from Midwest management talked with Meyer after receiving Sheriff's report. During the next month Sheriff learned that Meyer had inappropriately touched, kissed, or "come on to" a patient at their clinic on three occasions. Then in June a second patient reported being inappropriately touched by Meyer. Sheriff reported these complaints to Proffitt.

In July Meyer resumed physical contact with Sheriff, grabbing at her and embracing her. After he did the same thing in August, Sheriff sought counseling. Then on September 14 Meyer grabbed her three times as they were both walking down a clinic hallway. In each incident he wrapped his arm around her shoulder, pulled her close, and ran his hand down the side of one breast before squeezing the

other into his body.[2]  She was unable to break free of his grasp.  That afternoon Sheriff reported all these incidents to Proffitt and Dr. Vrbicky.

In a letter forwarded to Sheriff by Proffitt, Midwest's attorney advised it on September 23 "to take aggressive action to protect itself" and recommended several measures to stop Meyer's inappropriate behavior.  In the following weeks Sheriff had to contact Midwest repeatedly, however, to ask it to do something about Meyer and to let her know what action it was taking.

Midwest met with Meyer for the first time seven weeks after Sheriff's September complaint.  On November 4, 2005, Dr. Vrbicky asked Meyer to participate in counseling and to sign a document acknowledging the complaints about "acts of sexual impropriety and familiarity you have committed."  That document also set probation conditions for Meyer and warned him that further complaints could result in his termination.  Meyer refused to attend counseling or to sign the document.  He also began to behave in intimidating ways toward Sheriff.  He mocked her by holding his hands in the air around patients to show that he was not touching anyone.  He sat beside her at meetings despite the availability of other seating.  On one occasion he blocked a doorway while telling her to "put [her] problems aside."  Sheriff reported each incident, as well as a third patient complaint about him in December.

Throughout this period, Meyer had continued to reject Midwest's remedial conditions.  Dr. Vrbicky renewed them in a January 4, 2006 letter, but Meyer again refused to cooperate.  In a January 13 meeting with physician's assistant John Davies, he once again turned down Midwest's requests.  Finally on February 23 he

---

[2]On appeal Midwest complains that Sheriff did not mention her breasts being touched until her redirect examination; it did not raise any objections to her testimony at trial, however.

agreed to attend sexual harassment training but refused any form of mental health counseling. Although Midwest expected Meyer to attend training on five separate days, he went to a single session.

On January 2, 2006, Sheriff was informed by Davies that Meyer would be terminated within 45 days. He was not, and Sheriff was never informed why he remained on the job after the 45 day period expired. She was told nothing further about any investigation by Midwest or about Meyer's eventual consent to treatment. Meanwhile, Sheriff continued counseling and was treated for increased anxiety, stress, depression, and shortness of breath. She also suffered migraine headaches with greater frequency, which caused her to miss work and affected her performance. The stress also interfered with her family life. Convinced that Midwest would take no action against Meyer, Sheriff resigned on April 10, 2006.

Sheriff brought this action on December 11, 2007, alleging hostile work environment and constructive discharge, in violation of Title VII of the Civil Rights Act of 1964 as amended by the Equal Employment Opportunity Act of 1972, 42 U.S.C. § 2000e-2(a), and gender discrimination, in violation of the Nebraska Fair Employment Practice Act, Neb. Rev. Stat. § 48-1101 et seq. The district court denied Midwest's summary judgment motion, and the case proceeded to a jury trial. Midwest was awarded a directed verdict on Sheriff's state law claim, but the jury found for Sheriff on her hostile work environment claim and awarded $100,000 in compensatory damages. The jury ruled against Sheriff on her constructive discharge claim. Midwest's subsequent motions for judgment as a matter of law, for a new trial, and for remittitur were denied.

Midwest appeals the denial of its post trial motion for judgment as a matter of law, contending that the evidence was insufficient to sustain the jury's hostile

work environment verdict.  It also appeals the denial of its motion for remittitur or a new trial on the issue of damages.

## II

Denial of a post trial motion for judgment as a matter of law is reviewed de novo, and the district court is to be affirmed unless there was "'a complete absence of probative facts to support the conclusion reached' so that no reasonable juror could have found for the nonmoving party."  Hathaway v. Runyon, 132 F.3d 1214, 1220 (8th Cir. 1997) (quoting Ryther v. KARE 11, 108 F.3d 832, 836 (8th Cir. 1997) (en banc)).  The evidence must be viewed in the light most favorable to the nonmoving party while assuming as proven all facts her evidence tends to show, resolving all evidentiary conflicts in her favor, and according her all reasonable inferences. Id.

Title VII's prohibition of discrimination in employment on the basis of sex, 42 U.S.C. § 2000e-2(a), includes sexual harassment, which "has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive work environment," Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 65–66 (1986) (quoting 29 C.F.R. 1604.11(a)(3)).

To prove that sexual harassment by a nonsupervisor has created a hostile work environment in violation of Title VII, a plaintiff must establish:

> (1) [that she belongs to] a protected group; (2) [that she suffered] unwelcome harassment; (3) [that there was] a causal nexus between the harassment and her membership in the protected group; (4) that the harassment affected a term, condition, or privilege of [her] employment; and (5) that the employer knew or should have known of

the harassment and failed to take prompt and effective remedial action.

Carter v. Chrysler Corp., 173 F.3d 693, 700 (8th Cir. 1999).

The jury was instructed on each element of a hostile work environment claim and found for Sheriff. Midwest does not contest that she belongs to a protected group or that she was subjected to unwelcome harassment. It argues however that no reasonable jury could find that her gender was the cause of the alleged harassment; that a term, condition, or privilege of her employment was affected; or that it failed to take prompt and effective remedial action. We consider each contention in turn.

A work environment is sexually hostile if it exposes an individual to disadvantageous terms or conditions of employment on the basis of his or her gender. Scusa v. Nestle U.S.A. Co., Inc., 181 F.3d 958, 965 (8th Cir. 1999). "[T]he plaintiff . . . must always prove that the conduct at issue was not merely tinged with offensive sexual connotations, but actually constituted 'discrimination because of sex.'" Oncale v. Sundowner Offshore Services, Inc., 523 U.S. 75, 81 (1998) (quoting Title VII) (internal alterations omitted). "The critical issue, Title VII's text indicates, is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed.'" Id. at 80 (quoting Harris v. Forklift Systems, Inc., 510 U.S. 17, 25 (1993) (Ginsberg, J., concurring)). When "sexual behavior [is] directed at a woman [it] raises the inference that the harassment is based on her sex." Burns v. McGregor Elec. Ind., Inc., 955 F.2d 559, 564 (8th Cir. 1992).

Midwest asserts that there was insufficient evidence to establish the requisite causal nexus between Meyer's conduct and Sheriff's gender. Sheriff testified, however, that Meyer kissed her on the forehead and made physical contact with her

on multiple occasions. Most disturbing to her were Meyer's embraces, particularly when he pulled her against his body and brushed his hand against her breast. Included in the evidence presented to the jury was the document Midwest asked Meyer to sign in which it described his conduct as "acts of sexual impropriety and familiarity." This evidence was sufficient to show that Meyer's conduct was based on sex. Cf. Rorie v. United Parcel Service, Inc., 151 F.3d 757, 762 (8th Cir. 1998) (supervisor patted employee's back, brushed against her, and told her she smelled good); Hathaway, 132 F.3d at 1222 (coworker twice touched plaintiff's buttocks and harassed her with suggestive noises after being rebuffed).

Midwest protests that Meyer is just a "touchy person" and that he patted men on the buttocks, the implication being that his conduct was gender neutral. There was however no evidence that Meyer pulled men into his body nor of any complaints by males. Only Sheriff and three female patients complained that he had touched them inappropriately. The sexual nature of that conduct justifies an inference that it was sexually discriminatory. See Burns, 955 F.2d at 564.

A sexually hostile work environment is one in which the sexual harassment would reasonably be perceived, and is perceived by the victim, as "'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" See Harris, 510 U.S. at 21–22 (quoting Meritor, 477 U.S. at 67). Midwest does not dispute that Sheriff subjectively perceived her workplace as hostile, but it denies that a reasonable jury could find that it was objectively hostile. Relevant factors to determine objectivity include the frequency and severity of the discriminatory conduct; whether it can be characterized as "physically threatening or humiliating, or a mere offensive utterance"; whether it presents an unreasonable interference with the employee's work performance, Harris, 510 U.S. at 23, or "make[s] it more difficult to do the job," id. at 25 (Ginsberg, J., concurring) (internal alteration omitted).

The inquiry required to separate actionable harm from "merely unpleasant conduct" is necessarily a fact intensive one, <u>Moring v. Ark. Dep't of Corrections</u>, 243 F.3d 452, 456 (8th Cir. 2001), and encompasses all circumstances supported by credible evidence, <u>Harris</u>, 510 U.S. at 23. The whole pattern of conduct must be examined, for its severity and pervasiveness cannot be fully understood by "carving it 'into a series of discrete incidents.'" <u>Hathaway</u>, 132 F.3d at 1222 (citation omitted); <u>see also</u> <u>Nat'l R.R. Passenger Corp. v. Morgan</u>, 536 U.S. 101, 115 (2002). For these reasons it is up to the jury "to decide whether particular conduct is 'egregious enough' to merit an award of damages." <u>Hathaway</u>, 132 F.3d at 1221 (quoting <u>Harris</u>, 510 U.S. at 24 (Scalia, J., concurring)).

Considering the evidence and drawing all reasonable inferences from it in the light most favorable to Sheriff, we cannot say that Meyer's conduct and the conditions it created were insufficiently severe or pervasive as a matter of law. Sheriff endured repeated unwelcome and offensive physical contact from Meyer for approximately two years despite her complaints to management. He kissed her and touched her breasts with both his hand and body. Sheriff's attempts to mitigate the harm—first by keeping her distance, then by personally confronting him, and later by asking Midwest to intervene—did not succeed in stopping him. Her concerns were exacerbated when Midwest delayed in confronting Meyer, when he refused its remedial demands, and when he acted in ways the jury could infer were intended to intimidate her—mocking her by holding his hands in the air around patients, taking the seat closest to her at meetings, and once blocking her from leaving an office while admonishing her to "put [her] problems aside." <u>See</u> <u>Carter</u>, 173 F.3d at 702 (humiliation, intimidation, and proximity to harasser amplify workplace hostility); <u>Hathaway</u>, 132 F.3d at 1222–23 (same).

The jury could reasonably find that Midwest did not take Sheriff's complaints seriously, given its repeated failure to keep her apprised of its response

or to follow through on its stated intentions. Although Dr. Vrbicky and Proffitt told her that Meyer's conduct would not be tolerated and that Midwest "must act aggressively," seven weeks passed before the clinic mentioned her complaint to him. Months later, Sheriff learned that Midwest had still not enforced any remedial conditions and that it would not fire Meyer despite Davies' assurances to the contrary. At the time Sheriff resigned, seven months after Meyer's last unwelcome embrace, she still had little reason to believe that Midwest was taking effective action. It had not even informed her that Meyer had consented to harassment training.

The jury heard evidence from both parties. Midwest did not call Meyer to rebut Sheriff's testimony. "Once there is evidence of improper conduct and subjective offense, the determination of whether the conduct rose to the level of abuse is largely in the hands of the jury." Howard v. Burns Bros., Inc., 149 F.3d 835, 840 (8th Cir. 1998). The jury carefully considered the evidence and distinguished that which created a hostile work environment from that which failed to make out a constructive discharge. A jury's verdict is not lightly overturned. See Hathaway, 132 F.3d at 1220–21.

To subject a colleague to a sexually hostile workplace can "make [her] workplace hellish," see Baskerville v. Culligan Int'l Co., 50 F.3d 428, 430 (7th Cir. 1995), and it amounts to disparate treatment on the basis of an impermissible classification, see Meritor, 477 U.S. at 64. A reasonable jury could well find that Meyer's conduct and Midwest's response affected a term, condition, or privilege of her employment.

Midwest last argues that as a matter of law its remedial measures were prompt and effective. See Cheshewalla v. Rand & Son Const. Co., 415 F.3d 847, 851 (8th Cir. 2005). On the record here, however, the promptness and adequacy of

-10-

its response were fact questions for the jury. See Howard, 149 F.3d at 841 ("Once the plaintiff makes a submissible case, the promptness and adequacy of the employer's response to a complaint of harassment are fact questions for the jury to resolve."). Midwest took no action after Sheriff's first complaint, waited seven weeks to confront Meyer after her second complaint, failed throughout to keep Sheriff informed, and never identified who was responsible for the investigation. Moreover, Meyer never fully consented to Midwest's remedial demands, and he continued to harass Sheriff by trying to mock and intimidate her.

For these reasons the district did not err by denying Midwest's post trial motion for judgment as a matter of law.

III

Midwest contends that the $100,000 compensatory damage award is excessive and against the weight of the evidence. The district court rejected that argument when it denied Midwest's motion for a new trial or for remittitur. Remittitur is appropriate "only when the verdict is so grossly excessive as to shock the conscience of the court." Eich v. Bd. of Regents for Cent. Mo. State Univ., 350 F.3d 752, 763 (8th Cir. 2003) (citation omitted). We review for a manifest abuse of discretion, Taylor v. Otter Tail Corp., 484 F.3d 1016, 1019 (8th Cir. 2007), and "will reverse a denial of remittitur only when in rare circumstances we are pressed to conclude that the verdict represents a monstrous or shocking injustice." Benny M. Estes & Assocs., Inc. v. Time Ins. Co., 980 F.2d 1228, 1235 (8th Cir. 1992) (citation omitted).

The damage award which the jury found supported by the evidence is not shocking, monstrous, or plainly unjust. Cf. Eich, 350 F.3d at 754 (reinstating award of $200,000 in noneconomic damages for hostile work environment claim).

-11-

Sheriff testified that Meyer's conduct and Midwest's response to it caused her significant emotional trauma. She received counseling and treatment for increased anxiety, stress, depression, shortness of breath, and migraine headaches. She described how the migraine headaches caused her severe stomach aches and vomiting, inhibiting her work performance and forcing her to miss work. Both she and her husband testified about the deleterious effects of the harassment on their family life. "This court has consistently held that 'awards for pain and suffering are highly subjective and should be committed to the sound discretion of the jury, especially when the jury is being asked to determine injuries not easily calculated in economic terms.'" Id. at 763 (citations omitted).

Midwest objects that Sheriff failed to prove that she had obtained mental health counseling or that she was forced to increase her antianxiety medication. Sheriff testified, however, that the pastor with whom she underwent counseling was also a licensed psychologist and that a Midwest nurse temporarily increased her antianxiety medication. Midwest's objection that Sheriff's emotional distress was not supported by expert testimony is unavailing, however, for "'[a] plaintiff's own testimony, along with the circumstances of a particular case, can suffice to sustain the plaintiff's burden [to prove emotional damages].'" Kim v. Nash Finch Co., 123 F.3d 1046, 1065 (8th Cir. 1997) (citation omitted).

The dissent asserts that Sheriff should be limited to $50,000 in noneconomic damages under 42 U.S.C. § 1981a(b)(3). Midwest has not pursued this argument either in the district court or on appeal. Section 1981a(b)(3) permits an award of noneconomic damages for intentional discrimination in employment but sets limits on their amount corresponding to the size of a defendant business. Fifty thousand dollars is the maximum possible award of noneconomic damages attainable from businesses with 14 to 100 employees, § 1981a(b)(3)(A); $100,000 is the limit for companies with 101 to 200 employees, (b)(3)(B); $200,000 is the maximum where

there are 201 to 500 employees, (b)(3)(C); and $300,000 is the limit for companies with more than 500 employees, (b)(3)(D).

In her complaint in the district court Sheriff alleged that Midwest had "fifteen or more employees." (Emphasis added). In its answer to the complaint Midwest admitted that allegation, and the pretrial order includes that statement as an uncontroverted fact. Sheriff's prayer for relief included "compensatory damages for . . . mental pain and suffering." Midwest was thus aware before trial that Sheriff had the recovery of noneconomic damages in mind, in the amount of $50,000 or more.

In its post trial motions in the district court and in its appellate arguments Midwest attacked the damage award on the ground that Sheriff's emotional distress evidence was insufficient to support the jury award. It has not relied on § 1981a(b)(3) or sought to limit Sheriff's noneconomic damages under it, nor has it submitted any evidence that it has fewer than 101 employees.

At oral argument on appeal counsel for Midwest was asked, "how 42 U.S.C. § 1981a[(b)](3)(A) got lost in the shuffle?" Counsel for Midwest responded that it was "a statute that we don't claim applies here." Midwest's basic damages position has always been that Sheriff did not provide sufficient evidence to justify her award for emotional distress damages.

For these reasons we conclude that the district court did not abuse its discretion by denying Midwest's motion for new trial or remittitur.

IV

The jury reasonably found from the evidence produced that Sheriff was subjected to a sexually hostile work environment that affected a term, condition, or privilege of her employment and for which Midwest failed to take prompt and effective remedial action. The district court also did not abuse its discretion in concluding that the jury's damage award was not excessive or against the weight of the evidence.

Accordingly, the judgment of the district court is affirmed.

BEAM, Circuit Judge, concurring and dissenting.

I concur in the court's opinion except for its conclusion that the damages limitation found in 42 U.S.C. § 1981a(b)(3)(A) should be disregarded in this action. At the outset, I note that the two cases cited by the court, American General Finance Corp. v. Parkway Bank & Trust Co., 520 F.2d 607, 608 (8th Cir. 1975) and Cole v. International Union, United Automobile Aerospace & Agricultural Implement Workers, 533 F.3d 932, 936 (8th Cir. 2008), are almost wholly inapposite to a fair determination of this phase of the dispute.

It was not until 1991 that Congress made damages available under Title VII and even then, Congress carefully limited the amount recoverable in an individual case, calibrating the maximum recovery to the size of the employer. Gebser v. Lago Vista Indep. Sch. Dist., 524 U.S. 274, 286 (1998). For purposes of this case, this calibration appears in 42 U.S.C. § 1981a(b)(3)(A) and (B) which state:

(3)     Limitations

The sum of the amount of compensatory damages awarded under this section for future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuinary losses, and the amount of punitive damages awarded under this section, shall not exceed, for each complaining party–

(A)   in the case of a respondent who has more than 14 and fewer than 101 employees in each of 20 or more calendar weeks in the current or preceding calendar year, $50,000;

(B)   in the case of a respondent who has more than 100 and fewer than 201 employees in each of 20 or more calendar weeks in the current or preceding calendar year, $100,000;

and in § 1981a(c)(2) which states

(2)   the court shall not inform the jury of the limitations described in subsection (b)(3) of this section.

Because of the limitations in subsection (b)(3) and the evidentiary restriction in subsection (c)(2), the ultimate quantity determination of compensatory damages, the only damages in play in this case, is a matter for the court, after verdict, rather than a matter for the jury. See MacGregor v. Mallinckrodt, Inc., 373 F.3d 923, 927 (8th Cir. 2004); Mendez v. Perla Dental, No. 04 C 4159, 2008 WL 821882, at *3 (N.D. Ill. Mar. 26, 2008). As an element of the cause of action authorized by Title VII, Sheriff had the burden of proof on all issues relating to her damages. MacGregor, 373 F.3d at 934. And, no plaintiff claiming damages under Title VII can complain of unfair surprise, prejudice or lack of opportunity to respond when confronted with these damages limitations because they are part of the same

statutory scheme a plaintiff uses to bring his or her claim. <u>Oliver v. Cole Gift Ctrs., Inc.</u>, 85 F. Supp. 2d 109, 112 (D. Conn. 2000).

While most courts decline to strike damage prayers that exceed statutory limitations, <u>Beam v. Concord Hospitality, Inc.</u>, No. 93-4188, 1996 WL 455020, at *6 (D. Kan. July 8, 1996), there is no statutory or precedential reason that the burden of proof of the employee-numerosity requirements of §1981a do not remain with the plaintiff at all times. <u>Oliver</u>, 85 F. Supp. 2d at 111 (holding that plaintiff cites no case law holding that statutory limitations must be pled as an affirmative defense).

The closest we come to a procedure for proof of the employee numbers variously specified in Title VII is found in <u>Arbaugh v. Y & H Corp.</u>, 546 U.S. 500 (2006). In Title VII, Congress limited the definition of "employer" to include only those having fifteen or more employees. 42 U.S.C. § 2000e; <u>Arbaugh</u>, 546 U.S. at 503. Y & H argued that proof of a defendant's "employer" status was jurisdictional and the issue could be raised at any time, even after trial. In answering, in the negative, the question of whether this requirement was a matter of subject matter jurisdiction, or not, the Court stated "[w]e reject that categorization and hold that the numerical threshold does not circumscribe federal-court subject-matter jurisdiction." <u>Arbaugh</u>, 546 U.S. at 504. Instead, the Court stated "the employee-numerosity requirement relates to the substantive adequacy of Arbaugh's Title VII claim" and, thus, could not be raised defensively after the close of trial on the merits. <u>Id.</u> The Supreme Court did not, however, relieve a plaintiff of the responsibility of establishing her Title VII claims and damages, including those associated with employee numerosity. The most that can be gleaned from <u>Arbaugh</u> on the question of employee numbers is that any proof that is the burden of the defendant must relate to "employer" status and be raised by a defendant in a

-16-

pleading, in a motion for judgment or otherwise asserted at the trial on the merits. Id. at 507.

Since the substantive adequacy of Sheriff's claim for damages in this litigation is governed by subsections 1981a(b)(3)(A) and (B), evidence on numerosity boundaries remain her burden. As earlier noted, the court, post verdict, enters the final judgment on damages upon consideration of the § 1981a limitations. Accordingly, if any information from the defendant is required, which is doubtful, direct or inferential notice of employee numerosity presented to the trial judge prior to completion of the trial on the merits is sufficient. Such notice was given in this case by Midwest through Midwest's July 6, 2009, Renewed Motion for Judgment as A Matter of Law (JAML) in which the clinic requested a judgment limited to $50,000 in damages. See Docket Entry 75. As required by § 1981a(c)(2), the case was submitted to the jury without evidence of employee numbers except, of course, for Sheriff's allegation that Midwest employed "15 or more" individuals, the number required to prove that Midwest was an "employer" as defined in Title VII. Midwest admitted this allegation in its answer. Thus, at that point, the only proof of Midwest's employment numbers was "fifteen," and it originated with Sheriff.

The jury returned its verdict at 4:55 p.m. on June 24, 2009. Judgment on the verdict was entered by the court on June 25, 2009. Midwest's motions for JAML, New Trial and to Alter or Amend Judgment were timely filed on July 6, 2009, stating, in part, that "damages, if any is (sic) proper at all, should not exceed $50,000, the sum set forth in Plaintiffs' (sic) damages evidence." This was sufficient notice to the trial judge that Midwest objected to the $100,000 verdict the court had entered on June 25 in violation of § 1981a(b)(3). Midwest's post-verdict motions were denied on September 16, 2009, at which time the court

-17-

entered judgment for Sheriff's attorney fees. Accordingly, trial on the merits of this case concluded on that date without any further action by the court on the matter of the amount of damages. At that point, the final decision of the district court became appealable under 28 U.S.C. § 1291.[3]

I concede that Midwest did not directly allude in its motion for JAML to the 42 U.S.C. § 1981a(b)(3) limitations. But, the district court was charged with applying applicable law to the case and specific reference to the statute was not

---

[3]The court apparently suggests that Midwest forfeited or waived the damages limitations issue by attacking the damages award "on the ground that Sheriff's emotional distress evidence was insufficient to support the jury award. It has not relied on § 1981a(b)(3) or sought to limit Sheriff's noneconomic damages under it, nor has [Midwest] submitted any evidence that it has fewer than 101 employees." Ante at 13. First, Midwest did not have the burden of presenting such evidence. Second, the court's statements are incorrect. Midwest's opening brief on appeal states,

> Midwest suggests that the damages, if any are proper at all, should not exceed $50,000, the sum set forth in Sheriff's damages evidence reduced by savings admitted during her testimony at trial. (T 130:11-138:19; JA 308-314.); *see* 42 *USC* § 1981a(b)(3)(D) (establishing a cap of $50,000 on emotional distress damages for respondents, such as Midwest, with fewer than 101 employees). This will reduce the judgment to a reasonable sum reflective of the evidence. This relief is authorized by *F R Civ P* 59e.

Appellants' Br. at 36. This, along with the various post-verdict motions, is more than enough notice to the district court and this panel that neither forfeiture nor waiver, as defined by this court, United States v. McCoy, 496 F.3d 853, 856 (8th Cir. 2007), are applicable, or that an element of the statutory cause of action created by Congress may be ignored at trial on the merits or that a misstatement at oral argument of the issues framed on appeal should cost the defendant $50,000.

required at that point.  <u>Higgins v. Fedex Ground Package Sys., Inc.</u>, 592 F.3d 853, 863 (8th Cir. 2010); <u>Hill v. N. Tex. State Hosp.</u>, No. 7:09-CV-158, 2010 WL 330209, at *2 (N.D. Tex. Jan. 26, 2010).

Even assuming that the court majority is correct that nothing in the record exists, directly or by reasonable inference, with regard to § 1981a(b)(3) employee numbers, substantial unfairness arises when Sheriff is allowed to avoid adducing easily discoverable evidence in support of the substantial adequacy of a statutory element of her damages claim but is permitted to retain an unsupported judgment because Midwest purportedly waived application of the limitation provisions by failing to rely on them below.  This is especially true when a search of the record fails to disclose even a hint that Midwest has or ever had the 101 employees necessary to support the $100,000 award.

It seems totally incongruous that Sheriff's silence on employee numbers should carry the day in her quest for an unsupported judgment and Midwest's purported silence on evidence it had no duty to adduce should be viewed as a waiver of a statutorily imposed limitation.  This incongruity is especially intense because a trial judge in this circuit is permitted to take judicial notice of employee numbers, post verdict, in a Title VII case, <u>MacGregor</u>, 373 F.3d at 933, and because there is no showing that Sheriff ever requested the trial judge to take such notice.  At the very least, this case should be remanded to permit Midwest to offer evidence of employee numerosity.  Affirming the $100,000 judgment is error.  I dissent.

_____